940 F.2d 665
 UNPUBLISHED DISPOSITION
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Charles E. JOHNSON, Petitioner-Appellant,
v.
Jerry D. GILMORE, Warden Hill Correctional Center, and
Roland W. Burris, Attorney General of the State of
Illinois,* Respondents-Appellees,
 No. 90-1723.
 United States Court of Appeals, Seventh Circuit.
 Submitted June 10, 1991.**
Decided Aug. 15, 1991.
 
 Before CUDAHY and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 
 ORDER
 
 1
 Petitioner-Appellant, Charles E. Johnson, appeals from the district court's denial of his petition for writ of habeas corpus filed pursuant to 28 U.S.C. Sec. 2254. Johnson alleges that his due process rights were violated when he was identified as one of the robbers following a suggestive show-up and that statements he made to a police officer which were taken in violation of Miranda were improperly admitted as rebuttal evidence at trial. We affirm.
 
 I.
 
 2
 Johnson was convicted in state court of being one of three people who entered a tavern in Rock Island, Illinois, at approximately 11:00 A.M. on July 19, 1986, holding the owner and the customers at gunpoint and robbing them of their money. Johnson and his female co-defendant collected the money while the other man involved in the robbery brandished the weapon. Johnson also ripped the telephone from the wall during the incident.
 
 
 3
 Approximately three to four minutes after receiving a report of the robbery, a police officer observed Johnson and two companions driving south on 11th Street in Rock Island away from the tavern. The officer followed the vehicle for a brief time and eventually stopped it when the vehicle turned onto a one-way street heading in the wrong direction. After he stopped the vehicle, the police officer discovered several wallets and a handbag in the car and determined by radio that they belonged to the victims of the robbery at the tavern. The officer arrested all three of the occupants of the vehicle and took them back to the tavern.
 
 
 4
 The robbery victims were still at the tavern when Johnson and his co-defendants were returned to the scene. The police officers brought each of the suspects out of the squad car separately and placed the suspect on the sidewalk in front of the tavern window. The victims inside the tavern then stepped to the window to view each suspect. The victims were not told that the robbers had been apprehended and in addition they were not permitted to discuss the identification procedure amongst themselves during the process. The owner of the bar and three patrons positively identified Johnson as one of the robbers.
 
 
 5
 After the show-up was concluded, Johnson was taken to the police station where he was questioned by Officer Depaepe. During the questioning, Johnson told the officer how he came to be with the other defendants on the day of the robber and of their activities prior thereto. At that point, Johnson informed the officer that he did not want to answer any more questions, nonetheless, the questioning proceeded and Johnson continued to answer the questions. Johnson admitted that the defendants discussed the robbery before entering the tavern and that he accompanied his co-defendants into the bar and participated in the robbery. At a pre-trial suppression hearing, the trial court ruled that the statements that Johnson made prior to asserting his right to remain silent were admissible as substantive evidence and the statements made thereafter were admissible only as impeachment evidence. Johnson took the stand at trial and denied any involvement in the robbery. Thus, during rebuttal, the state recalled Officer Depaepe and he testified as to Johnson's admission of his participation in the robbery.
 
 
 6
 The jury returned a guilty verdict against Johnson. The conviction was affirmed on direct appeal to the Illinois Court of Appeals in an unpublished decision. The Illinois Supreme Court denied leave to appeal. Thereafter, Johnson filed a petition for writ of habeas corpus in the district court. The district court denied the writ and this appeal followed.
 
 II.
 A. Identification Testimony
 
 7
 Johnson initially argues that his due process rights were violated when the identification testimony was introduced at trial, because of the suggestive nature of the pre-trial identification procedure used in this instance. Johnson challenges the witnesses' testimony regarding both in-court and out-of-court identification. The test to be applied in determining the admissibility of the challenged identification testimony is a two-part inquiry. Initially, we must determine whether the police used an unduly suggestive procedure in obtaining the identification. If so, we must "determine whether, under all of the circumstances, that suggestive procedure resulted in a substantial likelihood of irreparable misidentification." United States ex rel. Lee v. Flannigan, 884 F.2d 945, 948 (7th Cir.1989) (citations omitted). In Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253 (1977), the Supreme Court concluded that "reliability is the linchpin in determining the admissibility of identification testimony...." The factors to be considered in evaluating the reliability of a witness' identification are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and, (5) the length of time between the crime and the confrontation. Manson, 432 U.S. at 114, 97 S.Ct. at 2253 (quoting Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382 (1972)).
 
 
 8
 Because we believe that the identification testimony at issue in this case bears sufficient indicia of reliability to prevent a substantial likelihood of irreparable misidentification, we assume for the purposes of analysis, without deciding, that the show-up identification procedure used in this case was unduly suggestive. Walton v. Lane, 852 F.2d 268, 271 (7th Cir.1988) Our task thus becomes one of applying the Biggers factors to the facts surrounding the identification in this case. "In reviewing those factors, we note that while '[t]he ultimate determination of whether the identification is reliable is a mixed question of law and fact ..., findings of subsidiary facts made by the state court (i.e. the opportunity of the witness to observe the suspect) are entitled to a presumption of correctness.' " Id. (quoting Love v. Young, 781 F.2d 1307, 1311 (7th Cir.1986)).
 
 
 9
 The first factor we consider was the ability of the victims to view Johnson at the time of the crime. Each of the victims who identified Johnson in the show-up and later at trial specifically testified that he or she had an unobstructed view of Johnson's face during the robbery. The bar was well-lit because of the sunlight shining through the window. In addition, Johnson directly approached two of the victims and relieved them of their money. Finally, the attention of the tavern owner was apparently focused on Johnson when he ripped the telephone from the wall during the course of the robbery. From these circumstances, we conclude that the victims of the crime who identified Johnson had sufficient opportunity to form an impression of his appearance at the time of the robbery.
 
 
 10
 The second factor we must weigh is the attentiveness of the witnesses to the robber. Under this factor it is incumbent upon the court to determine whether the witnesses took advantage of their opportunity to view the assailant and the degree of their attentiveness. United States ex rel. Kosik v. Napoli, 814 F.2d 1151, 1158 (7th Cir.1987). The facts of this case support the conclusion that the witnesses took advantage of their opportunities to view Johnson during the robbery. Two identification witnesses, Lee Stropes and Maynard Johnson, testified that Johnson approached them individually to took their money. In addition, Joyce Medlock testified that she had an unobstructed view of Johnson as he took money from Stropes who was standing next to Medlock in the tavern. Medlock also noted that she had seen the defendants outside the tavern before she entered. Thus, the attention of the victim was focused on Johnson without distraction at that point. In addition, the fact that Johnson ripped the telephone off the wall indicates that Johnson engaged in another activity during the course of the robbery which caused the victims to direct their attention to him. In light of these circumstances, we agree with the district court's conclusion that the victims' degree of attentiveness to the defendant Johnson was relatively high.
 
 
 11
 The third factor to consider is the accuracy of the witnesses' prior description of the individuals involved in the robbery. In Dooley v. Duckworth, 832 F.2d 445 (7th Cir.1987), this court noted that "the focus of this inquiry is on the inaccuracies in the description and not its generality." Id. at 449. The Dooley court explained that "the rationale for an inquiry focusing on the inaccuracies rather than the generality is that 'many persons may lack the ability to articulate a detailed description of a person they have seen and yet can still identify him on sight.' " Id. at 449-50 (quoting Israel v. Odom, 521 F.2d 1370, 1375 (7th Cir.1975)).
 
 
 12
 Before the show-up procedure in this case, the witnesses described the robbers to the investigating officer as two black males and one black female. The female was described as wearing a white t-shirt and black and white pants. One of the males was described as wearing a dark shirt and blue jeans, while the other was described as wearing a blue t-shirt. In addition, the witnesses stated that the suspects drove away from the scene in a small red car. We note that the description is neither detailed nor exhaustive, however, focusing on inaccuracies rather than generality as Dooley dictates, we believe that the description was adequate and that the lack of detail does not seriously undermine the reliability of the identification testimony. The only inaccuracy in the description relates to the fact that the witnesses described the car in which the robbers drove away from the tavern as a small red car. In actuality, the car in which Johnson and his co-defendants were stopped was a two tone medium sized car. While this descrepancy might tend to indicate that the victims description was somewhat flawed, we are of the opinion that it falls far short of negating a finding of reliability. "This factor is, after all only a single component of a test based on the totality of the circumstances." Napoli, 814 F.2d at 1157. It should also be noted that, as the state argues, the incompleteness of the description can be attributed in part to the rapid sequence of events in this case, where the suspects were apprehended and positively identified as the robbers early on in the police investigation. On balance, we conclude that this factor neither significantly bolsters nor seriously detracts from the reliability of the identification testimony.
 
 
 13
 The fourth factor to be evaluated is the level of certainty of the witnesses in their identification of Johnson. In this instance, the four witnesses who identified Johnson at the show-up and at trial expressly stated their certainty in the identification. The owner of the tavern, Robert Norton, testified that there was "no doubt in his mind" that Johnson had participated in the robbery. Another witness, Lee Stropes, in response to a question as to whether there was any uncertainty as to his identification stated "not one dang bit." Stropes noted that his certainty was reinforced by the fact that, like the robber, Johnson had a goatee. A third witness, Joyce Medlock, also acknowledged that her certainty as to the identification was strengthened by the fact that Johnson had a goatee. Finally, in his testimony, Maynard Johnson stated that he expressed no doubt about the accuracy of his identification. Each witness emphasized that the degree of certainty in their identification was heightened by the fact that Johnson approached them personally to take their money.
 
 
 14
 Johnson emphasizes the fact that Medlock hesitated in her identification of Johnson at the suppression hearing. That emphasis is misplaced. At the hearing, Medlock stated that her hesitation was due to the fact that Johnson no longer had a goatee. Thus, it seems that rather than calling into doubt the show-up identification, Medlock's hearing testimony is related more to her concern over misidentifying one of the robbers in light of his alteration of his appearance. In addition, Johnson places much significance on the fact that of the four witnesses who identified Johnson at the show-up, only Norton was able to pick him out of a photo identification conducted at the states attorney's office in November 1986. There are any number of explanations for the failure of a witness to identify someone in a photo array, including the possibility that the photographs are old, of poor quality, or that they were taken from a different angle than the witness had of the person at the crime scene. At most, it would seem that the inability of three of the identification witnesses to identify Johnson in the photo array goes to the credibility of the identification testimony and not its admissibility. As such, it raised a factual question that was properly left to the jury for resolution. Cf. United States ex rel. Lee v. Flannigan, 884 F.2d 945, 950 (7th Cir.1989) ("[A] previous failure to make a positive identification from a photo array does not necessarily, or even normally, make the later identification less certain."). See also Napoli, 814 F.2d at 1160 (same).
 
 
 15
 The final factor to be weighed is the time between the crime and the confrontation. This factor seemingly weighs heaviest in favor of the reliability of the identification in this case. The three suspects were apprehended and returned to the tavern for an individual show-up within approximately twelve to eighteen minutes after the robbery had occurred. As such, it can hardly be argued that the images of the three robbers were not fresh in the witnesses' minds. The close proximity between the crime and the individual show-ups in this instance significantly diminishes the concern of misidentification due to fading memory. Thus, this factor strongly supports the conclusion that the identification was reliable, irrespective of the suggestive nature of the procedure used.
 
 
 16
 Considering the indicia of reliability associated with the identification testimony against any possibly corrupting effect of the suggestive identification procedure, we conclude that there was not a substantial likelihood of irreparable misidentification in this case. The application of the Biggers factors indicates that there are sufficient indicia of reliability to support the admission of the testimony. Therefore, we find no error in its admission.
 
 
 17
 B. Impeachment With Statements Taken in Violation of Miranda
 
 
 18
 Johnson next argues that the trial court improperly permitted a police investigator to provide impeachment testimony on rebuttal that during questioning Johnson admitted his involvement in the robbery. Prior to initiating the interrogation of Johnson, the police officer had obtained a written waiver of his Miranda rights from Johnson. In the initial part of the interrogation, Johnson told the officer how he came to be with his co-defendants on that day and he discussed their pre-robbery activities. Thereafter, Johnson told the police officer that he was asserting his right to remain silent. Nonetheless, the officer continued to ask questions and Johnson continued to answer, eventually admitting his involvement in the crime. At a pre-trial suppression hearing, the state court ordered that the admission would only be admissible for purposes of impeachment. At trial, Johnson took the stand and denied any part in the robbery. Thereafter, Officer Depaepe retook the stand and testified as to Johnson's prior inconsistent statements.
 
 
 19
 In Harris v. New York, 401 U.S. 222, 91 S.Ct. 643 (1971), the Supreme Court held that a defendant's prior inconsistent statements were properly used to impeach his trial testimony. The Harris court noted that "[i]t does not follow from Miranda that evidence inadmissible against an accused in prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." Id. at 224, 91 S.Ct. at 645. The Harris court emphasized that its decision was grounded in anti-perjury considerations. "The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." Id. at 226, 91 S.Ct. at 646. The Court reiterated its anti-perjury rationale in Oregon v. Haas, 420 U.S. 714, 723 95 S.Ct. 1215, 1221 (1975) noting that "inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from he defendant's own mouth."
 
 
 20
 In light of this strong policy concern, our focus shifts to a consideration of whether the trustworthiness of the rebuttal testimony from the police officer "satisfies legal standards." Thus the key inquiry with respect to the admission of the inculpatory statements for the limited purpose of impeachment is the question of whether the statements were voluntary and not coerced. See Haas, 420 U.S. at 722, 95 S.Ct. at 1221 and United States ex rel. Adkins v. Greer, 791 F.2d 590, 596 n. 5 (7th Cir.1986) (The key inquiry with respect to the admission of inculpatory statements as impeachment is on the issue of voluntariness.).
 
 
 21
 We turn to the facts of this case and apply the voluntariness analysis. In his brief on appeal, Johnson's argument is in the nature of a general attack on the credibility of all of Depaepe's testimony. However, that argument misses the mark. The credibility of Depaepe's report and his trial testimony is not at issue in this case. The decision of whether to credit the testimony of a witness is determined by the trier of fact and that determination does not impact upon the question of the voluntariness of Johnson's statements to the police. While Johnson makes some cursory allegations that the investigator tried to trick him into talking by saying that his co-defendants had plead guilty and implicated him in the robbery, Johnson also states that he did not believe the investigator when he made that statement. Thus, even though Johnson's allegations of trickery could arguably be considered coercive, he undermines the allegations by acknowledging that the statements were not the product of the alleged coercion. A review of the record reveals that there is no other evidence of duress or coercion associated with the questioning of Johnson. As such, under the totality of the circumstances, we conclude that the statements were given voluntarily and there was no error associated with the admission of those statements for purposes of impeachment. See United States v. Lott, 854 F.2d 244, 249 (7th Cir.1988) (In the absence of evidence that the prior inconsistent statements were coerced or involuntary, those statements are admissible for impeachment purposes at trial.).
 
 C. Ineffective Assistance of Counsel
 
 22
 Finally, Johnson raises an ineffective assistance of counsel claim; however, the scope of the claim is unclear. Johnson seemingly argues that his initial trial counsel was ineffective because he failed to adequately investigate Johnson's claim that he was at an auto parts store at the time of the robbery. There is no merit to this argument. Johnson's first trial counsel was permitted to withdraw and a second attorney was appointed to represent him. That attorney called the manager of the auto parts store at trial, who testified that he could not remember whether Johnson was there or not. Johnson maintains that if he had been approached earlier, the manager would have remembered that Johnson was there during the time of the robbery. Such speculation simply cannot be the basis of an ineffective assistance claim; therefore, the district court properly dismissed the claim without requiring the state to answer.
 
 
 23
 In addition, Johnson is seemingly attempting to challenge the conduct of counsel appointed to represent him in the habeas proceeding in the district court. Johnson's right to counsel only extended to his state appeal as of right. It did not extend to a federal habeas proceeding. See Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). As such, any ineffectiveness on the part of counsel in the district court could not rise to the level of a constitutional violation sufficient to undermine Johnson's state court conviction.
 
 
 24
 For all of the foregoing reasons, the decision of the district court denying the petition is hereby AFFIRMED.
 
 
 
 *
 Pursuant to Fed.R.App.P. 43(c)(1), Roland W. Burris has been substituted for Neil F. Hartigan
 
 
 **
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted on the briefs and record